## UNITED STATES DISTRICT COURT
## DISTRICT COURT OF NEW JERSEY

| | | |
|---|---|---|
| CARLI DIRIENZO, | : | |
| | : | |
| Plaintiff, | : | CIVIL ACTION NO. |
| | : | |
| v. | : | |
| | : | |
| BRETT DINOVI AND ASSOCIATES, | : | PLAINTIFF DEMANDS A |
| LLC; BRETT DINOVI and JASON | : | TRIAL BY JURY |
| GOLOWSKI | : | |
| | : | |
| Defendants. | : | |
| | : | |

Plaintiff, CARLI DIRIENZO, by and through undersigned counsel hereby files this Civil Action Complaint against Defendants BRETT DINOVI AND ASSOCIATES, LLC, BRETT DINOVI, and JASON GOLOWSKI (collectively "Defendants") and avers the following:

## PARTIES

1. PLAINTIFF CARLI DIRIENZO (hereinafter also referred to as "PLAINTIFF") is an individual female, who is a resident of the state of New Jersey.

2. At all times material, Defendant BRETT DINOVI AND ASSOCIATES, LLC (hereinafter referred to as "Defendant BDAA") has a corporate headquarters located at PO Box 8223, Cherry Hill, NJ 08002.

3. At all times material, Defendant BDAA operates a place of business at 3000 Atrium Way, Suite 430, Mt. Laurel, NJ 08054.

4. Upon information and belief, at all times material, BRETT DINOVI (hereinafter referred to as "Defendant DINOVI") owned and operated Defendant BDAA.

5. Upon information and belief, at all times material, Defendant DINOVI identified as a male.

6.  At all times material, in addition to being the owner of BDAA, Defendant DINOVI was and is employed as the Chief Executive Officer for Defendant BDAA.

7.  At all times material, Defendant DINOVI held supervisory authority over PLAINTIFF.

8.  At all times material, JASON GOLOWSKI (hereinafter referred to as "Defendant GOLOWSKI") was and is employed for Defendant BDAA as Chief Operating Officer.

9.  Upon information and belief, at all times material, Defendant GOLOWSKI identified as a male.

10. At all times material, Defendant GOLOWSKI held supervisory authority over PLAINTIFF.

11. At all times material, Defendants were PLAINTIFF's joint and/or sole employer.

## NATURE OF THE ACTION

12. PLAINTIFF complains pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e et seq. ("Title VII"), and the New Jersey Law Against Discrimination, N.J.S.A. §§ 10:5-1 et seq. ("NJLAD").

13. Furthermore, this action is to redress the Defendants' unlawful employment practices against PLAINTIFF, including Defendants' unlawful discrimination against PLAINTIFF because of her sex and for Defendants wrongful actions against PLAINTIFF leading up to, and including, her unlawful termination.

14. PLAINTIFF seeks declaratory and injunctive relief, actual damages, compensatory damages, punitive damages, reinstatement, attorneys' fees, litigation costs, and pre- and post-judgment interest as remedies for Defendants' violations of her rights.

15. Defendants systemically and willfully violated Plaintiff's rights under Title VII and NJLAD.

## JURISDICTION AND VENUE

16. This Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1331, which gives district courts jurisdiction over all civil actions arising under the Constitution, laws, and treaties of the United States.

17. This Court has jurisdiction in that this action involves a Federal Question under Title VII.

18. This Court also has supplemental jurisdiction over Plaintiff's NJLAD claims pursuant to 28 U.S.C. 1367 because they arise from the same nucleus of operative facts as Plaintiff's Title VII claims.

19. Venue is proper in the District of New Jersey based upon Defendants' residency and that a substantial part of the events or omissions giving rise to the claims herein occurred in this district.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

20. Around May 5, 2022, Plaintiff timely filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC").

21. Plaintiff's Charge of Discrimination was dual filed with the New Jersey Division of Civil Rights ("NJDCR").

22. Around March 27, 2023, the EEOC sent a Dismissal and Notice of Rights to PLAINTIFF by electronic mail.

23. This action is hereby commenced within ninety (90) days of receipt of the Dismissal and Notice of Rights.

24. Plaintiff has complied with all administrative prerequisites to bring this lawsuit

## MATERIAL FACTS

25. Around 2014, PLAINTIFF began working for Defendant BDAA as a Clinical Associate.

26. In July 2015, PLAINTIFF was promoted to an Executive Assistant.

27. In January 2019, PLAINTIFF was promoted to Director of Cultural Leadership.

28. In February 2021, PLAINTIFF was promoted to Executive Director of Business Growth.

29. Throughout her employment, PLAINTIFF performed her job responsibilities in a satisfactory, or above satisfactory, manner.

Defendant DINOVI's History of Sexism and Perpetuation of Sex-Based Stereotypes

30. From the beginning of PLAINTIFF's employment, Defendant DINOVI subjected PLAINTIFF and other similarly situated Defendant BDAA female employees to pervasive discrimination and harassment in the workplace due to their sex/gender.

31. By way of example, and by no means an exhaustive list, Defendant DINOVI forced PLAINTIFF and similarly situated Defendant BDAA female employees to sign a confidential document titled, "**17 Reasons Why Women Don't Make Good Leaders**."

32. Although PLAINTIFF and the other similarly situated Defendant BDAA female employees did not want to sign the above-mentioned document, they were fearful Defendant DINOVI would retaliate against them if they did not sign the document.

33. PLAINTIFF reluctantly signed the above-mentioned document.

34. This caused PLAINTIFF to feel uncomfortable, embarrassed, and distressed.

35. Upon information and belief, the similarly situated Defendant BDAA female employees also reluctantly signed the above-mentioned document.

36. On one occasion, PLAINTIFF's coworker Liz (female), Director of Operations, was nominated for a promotion of Executive Assistant to the CEO.

37. The CEO during this time was Defendant DINOVI.

38. Before Defendant DINOVI granted Liz the promotion, he asked PLAINTIFF to ask Liz if she intended to get pregnant.

39. This caused PLAINTIFF to feel uncomfortable, embarrassed, and distressed.

40. Fearful of losing her job if she did not obey Defendant DINOVI's request, PLAINTIFF asked Liz of her intentions to become pregnant.

41. During her conversation with PLAINTIFF, Liz informed PLAINTIFF of her intention to become pregnant.

42. After PLAINTIFF informed Defendant DINOVI that Liz intended on getting pregnant, Defendant DINOVI refused to promote Liz to Executive Assistant.

43. Upon information and belief, **Defendant DINOVI refused to promote Liz due to her potential of becoming pregnant**.

44. By way of further example, Defendant DINOVI refused to hold meetings with both female and male employees in the same room.

45. Rather, Defendant DINOVI would separate the female employees from the male employees and hold gender-separate meetings.

46. Defendant DINOVI would tell PLAINTIFF that he was meeting with his "secret boy band" when referring to the all-male meetings.

47. Upon information and belief, Defendant DINOVI separated the female employees from the male employees during meetings because he believed female employees were not equal to male employees.

48. By way of further example, Defendant DINOVI held the employee meetings at his home.

49. Defendant DINOVI continued to hold the employee meetings at his home, despite PLAINTIFF informing Defendant DINOVI that she and similarly situated Defendant BDAA female employees did not feel comfortable having work meetings at Defendant DINOVI's private residence.

50. This caused PLAINTIFF to feel uncomfortable, embarrassed, and distressed.

51. Upon information and belief, during the all-male employee meetings, Defendant DINOVI discussed relevant work-related topics.

52. However, during the female-only employee meetings, Defendant DINOVI discussed matters unrelated to work.

53. By way of example, and by no means an exhaustive list, at one of the female-only meetings, Defendant DINOVI discussed how women could prevent getting raped in parking lots.

54. By way of further example of sex/gender discrimination, during the work day, Defendant DINOVI frequently smoked cigars in the office.

55. Defendant DINOVI stated to PLAINTIFF that his cigar smoking affected the air quality of BDAA's female employees, but not BDAA's male employees.

56. Upon information and belief, Defendant DINOVI made the above statement because he believes only men are capable of smoking cigars.

57. On another occasion, Defendant DINOVI asked PLAINTIFF, and the similarly situated Defendant BDAA female employees, if they would prefer to be coached by a woman or a man.

58. Before PLAINTIFF or the similarly situated Defendant BDAA female employees could respond, Defendant DINOVI told them that they should want to be coached by a man.

59. Upon information and belief, Defendant DINOVI believes everyone should be coached by a man because men are natural born leaders.

60. By way of further example, Defendant DINOVI oftentimes referred to PLAINTIFF and the similarly situated Defendant BDAA female employees as "**men haters**."

61. This caused PLAINTIFF to feel uncomfortable, embarrassed, and distressed.

62. Due to her position, PLAINTIFF oftentimes assisted Defendant DINOVI in interviewing candidates for employment.

63. During these interviews, Defendant DINOVI would ask the female candidates if they intended on becoming pregnant and/or if they had childcare.

64. Defendant DINOVI did not ask male candidates these, or similar, questions.

65. **Upon information and belief, Defendant DINOVI refused to hire any female candidates who were pregnant, had the potential to become pregnant, or did not have childcare.**

66. Moreover, many of the male employees at Defendant BDAA received greater compensation than their female counterparts despite many of Defendant BDAA's female employees being more qualified than Defendant BDAA's male employees.

67. Notably, Defendant BDAA's "C-Suite," which represents Defendant BDAA's executive-level managers, consisted of only male employees despite many female employees being equally, if not more, qualified than the male employees.

Defendant DINOVI's Sex Discrimination Toward PLAINTIFF

68. Due to the nature of PLAINTIFF's position as Executive Director, PLAINTIFF and Defendant DINOVI often worked together.

69. Maybe almost, if not every time, PLAINTIFF was alone with Defendant DINOVI, Defendant DINOVI would ask PLAINTIFF if she wanted to **make a "million-dollar baby" with him**.

70. PLAINTIFF would immediately protest and respond that she did not want to have a baby with him.

71. Despite PLAINTIFF's opposition to Defendant DINOVI's discriminatory comment, Defendant DINOVI continued to ask PLAINTIFF if she wanted to have a baby with him.

72. This caused PLAINTIFF to feel humiliated, degraded, victimized, embarrassed, and emotionally distressed.

73. PLAINTIFF oftentimes traveled with Defendant DINOVI for work.

74. On one of the work-related trips, Defendant DINOVI told PLAINTIFF that **she won't be able to go on work trips anymore because she'll be "with her husband and family."**

75. This caused PLAINTIFF to feel uncomfortable, embarrassed, and distressed.

76. Upon information and belief, if PLAINTIFF became pregnant, Defendant DINOVI would reduce her duties, including, but not limited to, work-related travel.

77. Defendant DINOVI's statement perpetuates the stereotype that once women have a family, they can no longer work due to familial obligations.

78. Furthermore, Defendant DINOVI's sex/gender discrimination was evidenced by his numerous and frequent comments regarding PLAINTIFF's appearance.

79. On one occasion, Defendant DINOVI told PLAINTIFF that she **"looked frumpy" because her dress was not tight enough.**

80. On another occasion, Defendant DINOVI told PLAINTIFF that her **lipstick looked good on her.**

81. By way of further example, Defendant DINOVI told PLAINTIFF that he needed to "get better at delivering undesirable feedback to **females because females exhibit a pattern of much crying**" while men do not.

82. Defendant DINOVI's statement perpetuates the discriminatory stereotype that women are more emotional than males.

83. This caused PLAINTIFF to feel humiliated, degraded, victimized, embarrassed, and emotionally distressed.

84. Moreover, although irrelevant to the work performed at Defendant BDAA, Defendant DINOVI frequently used any opportunity he could to discuss the stereotypes of males and females.

85. For example, on June 14, 2021, Defendant DINOVI shared with PLAINTIFF a **series of notes** which included, but were not limited to, females' false allegations of sexual harassment, the reasons "why more females turn down invitations to travel to other states than males do;" the COVID-19 pandemic's disproportionate, negative impact on females' work-life balance compared to males; females' schedules being less flexible than males' schedules due to familial obligations; and males' refusal to be transparent around females "due to public execution and criticism for almost anything."

86. When PLAINTIFF received Defendant DINOVI's notes, she immediately asked him if he was trying to confirm a gender bias.

87. In response, Defendant DINOVI told PLAINTIFF to "[r]ead it more carefully and note what is simply my observations."

88. Defendant DINOVI did not deny that he was supporting a gender bias.

89. In or around September 2020, PLAINTIFF began dating her boyfriend, James.

90. When PLAINTIFF informed Defendant DINOVI that she had begun dating someone, Defendant DINOVI told PLAINTIFF that he had to meet and approve of PLAINTIFF's boyfriend before she could date him.

91. Around October 5, 2021, during one of the meetings between PLAINTIFF and Defendant DINOVI, Defendant DINOVI told PLAINTIFF that her boyfriend was "controlling [PLAINTIFF's life] because James is a police officer and [police officers] are controlling."

92. This caused PLAINTIFF to feel humiliated, degraded, victimized, embarrassed, and emotionally distressed.

93. Later that same day, PLAINTIFF texted Defendant DINOVI to ask what he meant by the above-mentioned statement.

94. Defendant DINOVI never responded.

95. Upon information and belief, Defendant DINOVI made the statement because he believes females are weak and should be controlled by men, especially men in possession of power and/or authority.

96. Around December 2021, BDAA began restructuring its employees' bonuses.

97. As a result of the restructuring, PLAINTIFF's pay was decreased.

98. Upon information and belief, most of Defendant BDAA's male employees did not receive a pay decrease.

99. Upon information and belief, Defendant BDAA male employees with less seniority than PLAINTIFF did not have their pay decreased.

100. Given that this was PLAINTIFF's first pay decrease during her employment with Defendant BDAA, PLAINTIFF immediately emailed Defendant GOLOWSKI to discuss her decrease.

101. As a result, on December 13, 2021, PLAINTIFF had a meeting with Defendant GOLOWSKI.

102. During the meeting, PLAINTIFF asked for performance feedback. In response, Defendant GOLOWSKI told PLAINTIFF her decrease in pay was not related to her performance.

103.    PLAINTIFF told Defendant GOLOWSKI that **she noticed that some individuals, particularly young Defendant BDAA female employees, were treated differently than their similarly situated male counterparts.**

104.    In response, Defendant GOLOWSKI validated Defendant DINOVI's actions and beliefs to PLAINTIFF.

105.    Defendant GOLOWSKI asked PLAINTIFF to provide him with examples.

106.    PLAINTIFF informed Defendant GOLOWSKI of the instance where Defendant DINOVI had refused to promote Liz once she had mentioned her intent to become pregnant.

107.    PLAINTIFF reminded Defendant GOLOWSKI how **it was "wrong" of Defendant DINOVI to refuse to promote Liz because of her intent to become pregnant.**

108.    Upon hearing this, Defendant GOLOWSKI immediately stopped the meeting and told PLAINTIFF she needed to speak to Defendant DINOVI.

109.    Thereafter, a meeting with Defendants GOLOWSKI and DINOVI was scheduled for December 17, 2021.

110.    Around December 17, 2021, PLAINTIFF met with Defendant DINOVI in his office.

111.    Defendant GOLOWSKI joined the meeting telephonically.

112.    During the meeting, Defendant DINOVI called PLAINTIFF "manipulative" for discussing Liz and the denial of her promotion with Defendant GOLOWSKI.

113.    **PLAINTIFF asked Defendant DINOVI if his treatment toward PLAINTIFF "had anything to do with the fact that she may potentially have kids**."

114.    Upon hearing this, Defendant DINOVI told PLAINTIFF that this would be their last meeting.

115.    PLAINTIFF was off from work on December 18, 2021 and December 19, 2021.

116. Around December 20, 2021, PLAINTIFF was working from home when Defendant DINOVI emailed PLAINTIFF informing her that she was suspended without pay beginning at 3:30 p.m.

117. PLAINTIFF was shocked, humiliated, and emotionally distressed by the suspension, as she did not partake in any activities that warranted a suspension.

118. Upon information and belief, PLAINTIFF's suspension was because of her sex/gender and/or opposition to Defendants' unlawful conduct and comments.

119. Around December 21, 2021, Lisa Cassidy, Director of Human Relations, texted PLAINTIFF informing her that Defendant DINOVI wanted to meet with her.

120. Around December 29, 2021, PLAINTIFF arrived at BDAA for a meeting with Defendant DINOVI.

121. During the meeting, Defendant DINOVI unlawfully terminated PLAINTIFF's employment.

122. PLAINTIFF was shocked by her termination, as she had been an exemplary employee.

123. Upon information and belief, PLAINTIFF's termination was because of her sex/gender and/or opposition to Defendants' unlawful conduct and comments.

124. PLAINTIFF was not provided any explanation for her termination.

125. As a result of DEFENDANTS' actions, PLAINTIFF felt extremely humiliated, degraded, victimized, embarrassed and emotionally distressed.

126. As a result of the acts and conduct complained of herein, PLAINTIFF has suffered and will continue to suffer the loss of income, the loss of salary, bonuses, benefits and other compensation which such employment entails, and PLAINTIFF also suffered future pecuniary losses, emotional pain, humiliation, suffering, inconvenience, loss of enjoyment of life, and

other non-pecuniary losses. PLAINTIFF has further experienced severe emotional and physical distress.

127.    That as a result of Defendants' conduct, the PLAINTIFF was caused to sustain serious and permanent personal injuries, including but not limited to permanent psychological injuries.

128.    As Defendants' conduct has been malicious, willful, outrageous, and conducted with full knowledge of the law, PLAINTIFF demands Punitive Damages as against all the Defendants, jointly and severally.

129.    PLAINTIFF claims that Defendants unlawfully discriminated against PLAINTIFF because of her sex and because she complained of and opposed the unlawful conduct of Defendants related to the above protected classes.

130.    The above are just some of the examples of the unlawful discrimination to which the Defendants subjected PLAINTIFF.

131.    Defendants have exhibited a pattern and practice of not only discrimination but also retaliation.

132.    PLAINTIFF claims alternative that PLAINTIFF is an Independent Contractor, and PLAINTIFF makes all applicable claims for the above conduct and facts under the applicable law pertaining to Independent Contractors. Furthermore, in such case, PLAINTIFF claims that Defendant owed and breached its duty to PLAINTIFF to prevent the harassment, discrimination, and retaliation and is liable therefore for negligence.

133.    PLAINTIFF claims a continuous practice of discrimination and claims a continuing violation and makes all claims herein under the continuing violations doctrine.

**COUNT I**
**TITLE VII DISCRIMINATION**
**42 U.S.C. § 2000e-2**
**(against Defendant BDA only)**

134.    Plaintiff, Carli DiRienzo, hereby incorporates all allegations contained in the above paragraphs as fully as if they were set forth at length.

135.    Title VII provides, in relevant part, that "it shall be an unlawful employment practice for an employer . . . to discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of [her] race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1).

136.    Title VII further provides that "an unlawful employment practice is established when the complaining party demonstrates that race, color, religion, sex, or national origin was a motivating factor for any employment practice, even though other factors also motivated the practice." 42 U.S.C. § 2000e-2(m).

137.    Defendants engaged in unlawful employment practices prohibited by Title VII by intentionally discriminating against Plaintiff with respect to her compensation, terms, conditions of employment because of Plaintiff's sex.  Defendants subjected Plaintiff to adverse tangible employment actions—defined as significant changes in Plaintiff's employment status, discipline, denial of training, failure to promote, reassignment with significantly different job responsibilities, and decisions causing changes in significant changes in her employment benefits.

138.    Plaintiff's protected characteristics played a determinative factor in Defendants' decisions.

139.    Defendants cannot show any legitimate nondiscriminatory reasons for their employment practices and any reasons proffered by Defendants for their actions against Plaintiff are pretextual and can readily be disbelieved.

140.    Alternatively, Plaintiff's protected status played a motivating part in Defendants' decisions even if other factors may also have motivated its actions against Plaintiff.

141.   Defendants acted with the intent to discriminate.

142.   Defendants acted upon a continuing course of conduct.

143.   Defendants acted with the intent to discriminate against Plaintiff because of her sex.

144.   Defendants wrongfully terminated Plaintiff, in violation of Title VII, solely or in part, because of her sex.

145.   Defendants wrongfully terminated Plaintiff, in violation of Title VII solely or in part because Plaintiff is a woman.

146.   As a result of the Defendants' violations of Title VII, Plaintiff has suffered damages including but not limited to: past and future lost wages, pain and suffering, inconvenience, mental anguish, loss of enjoyment of life, humiliation, emotional distress, reputational harm, diminishment of career opportunities, and other harm, both tangible and intangible.

**COUNT II**
**TITLE VII HOSTILE WORK ENVIRONMENT**
**42 U.S.C. § 2000e-2**
**(against Defendant BDA only)**

147.   Plaintiff, Carli DiRienzo, hereby incorporates all allegations contained in the above-mentioned paragraphs as fully as if they were set forth at length.

148.   Title VII also prohibits hostile work environment harassment, defined as unwanted comments or conduct regarding the plaintiff's protected characteristics that unwanted comments or conduct regarding the plaintiff's protected characteristics that have the purpose or effect of unreasonably interfering with the terms and conditions of the plaintiff's employment. Harris v. Forklift Systems, 510 U.S. 17, 21 (1993).

149.   An employer is strictly liable for supervisor harassment that "culminates in a tangible employment action, such as discharge, demotion, or undesirable reassignment." Burlington Industries, Inc. v. Ellerth, 524 U.S. 742 (1998)

150.    Respondeat superior liability for the acts of non-supervisory employees exists where "the defendant knew or should have known of the harassment and failed to take prompt remedial action." Andrews v. city of Philadelphia, 895 F.2d 1469, 1486 (3d Cir. 1990).

151.    Employer liability for co-worker harassment also exists where "the employer failed to provide a reasonable avenue for complaint." Huston v. Procter & Gamble Paper Prods. Corp., 568 F.3d 100, 105 (3d Cir. 2009).

152.    The Third Circuit has held that the retaliation provision of Title VII "can be offended by harassment that is severe or pervasive enough to create a hostile work environment." Jensen v. Potter, 435 F.3d 444, 446 (3d Cir. 2006).

153.    Here, Defendants' conduct occurred because of Plaintiff's legally protected characteristics and was severe or pervasive enough to make a reasonable person of the same legally protected classes believe that the conditions of employment were altered and that the working environment was intimidating, hostile, or abusive.

154.    Plaintiff's supervisors had the authority to control Plaintiff's work environment, and they abused that authority to create a hostile work environment.

155.    The conduct was severe.

156.    The conduct was emotionally damaging and humiliating.

157.    The conduct unreasonably interfered with Plaintiff's work performance.

158.    The conduct was so extreme that it resulted in material changes to the terms and conditions of Plaintiff's employment.

159.    The Defendants provided a futile avenue for complaint.

160.    The Defendants acted upon a continuing course of conduct.

161.   As a result of the Defendants' violations of Title VII, Plaintiff has suffered damages including but not limited to: past and future lost wages, pain and suffering, inconvenience, mental anguish, loss of enjoyment of life, humiliation, emotional distress, reputational harm, diminishment of career opportunities, and other harm, both tangible and intangible.

**COUNT III**
**TITLE VII RETALIATION**
**42 U.S.C. § 2000e-3**
**(against Defendant BDA only)**

162.   Plaintiff, Carli DiRienzo, repeats and realleges every allegation made in the above paragraphs of this complaint.

163.   Title VII protects employees from retaliation for attempting to exercise their rights under the Act:

> 42 U.S.C. § 2000e-3. Other unlawful employment practices
> (a) Discrimination for making charges, testifying, assisting, or participating in enforcement proceedings. It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because [she] has opposed any practice made an unlawful employment practice by this subchapter, or because [she] has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

164.   The Supreme Court in Burlington v. N. & S.F. Ry. V. White, 548 U.S. 53, 68 (2006) held that a cause of action for retaliation under Title VII lies whenever the employer responds to protected activity in such a way that "might have dissuaded a reasonable worker from making or supporting a charge of discrimination."

165.   Informal complaints and protests can constitute protected activity under the "opposition" clause of 42 U.S.C. § 2000e-3(a). Moore v. City of Philadelphia, 461 F.3d 331, 343 (3d Cir. 2006) ("Opposition to discrimination can take the form of informal protests of discriminatory employment practices, including making complaints to management.").

166. Title VII's anti-retaliation provision also protects employees who speak out about discrimination by answering questions during an employer's internal investigation. Crawford v. Metropolitan Gov't of Nashville and Davidson Cty., Tennessee, 555 U.S. 271, 277 (2009) (declaring that there is "no reason to doubt that a person can 'oppose' by responding to someone else's question just as surely as by provoking the discussion, and nothing in the statute requires a freakish rule protecting an employee who reports discrimination on her own initiative but not one who reports the same discrimination in the same words when her boss asks a question.").

167. Retaliation need not be job-related to be actionable under Title VII—an employer can effectively retaliate against an employee by taking actions not directly related to her employment or by causing her harm outside the workplace. White, 548 U.S. at 61-62 (rejecting authority from the Third Circuit and others requiring that the plaintiff suffer an adverse employment action in order to recover for retaliation).

168. "[A] plaintiff need not prove the merits of the underlying discrimination complaint, but only that '[she] was acting under a good faith, reasonable belief that a violation existed.'" Aman v. Cort Furniture Rental Corp., 85 F.3d 1074, 1085 (3d Cir. 1996); Griffiths v. CIGNA Corp., 988 F.2d 457, 468 (3d Cir. 1993); Sumner v. United States Postal Service, 899 F.2d 203, 209 (2d Cir. 1990), overruled on other grounds by Miller v. CIGNA Corp., 47 F.3d 586 (3d Cir.1995).

169. An employee need not be a member of a protected class to be subject to actionable retaliation under Title VII. See Moore, 461 F.3d at 342 ("Title VII's whistleblower protection is not limited to those who blow the whistle on their own mistreatment or on the mistreatment of their own race, sex, or other protected class.")

170.    Here, Defendants discriminated against Plaintiff because of her protected activity under Title VII.

171.    Plaintiff was acting under a reasonable, good faith belief that her right to be free from discrimination on the basis of sex and retaliation was violated.

172.    Plaintiff was subjected to materially adverse actions at the time or after the protected conduct took place.

173.    There was a causal connection between Defendants' materially adverse actions and Plaintiff's protected activity. In determining whether a plaintiff has produced evidence of causation, courts in the Third Circuit focus on two indicia: timing and evidence of ongoing antagonism. Plaintiff will rely on a broad array of evidence to demonstrate a causal link between her protected activity and Defendants' actions taken against her, such as the unusually suggestive proximity in time between events, as well as Defendants' antagonism and change in demeanor toward Plaintiff after Defendants became aware of Plaintiff's protected activity.

174.    Defendants' actions were "materially adverse" because they were serious enough to discourage a reasonable worker from engaging in protected activity.

175.    Defendants acted upon a continuing course of conduct.

176.    Plaintiff will rely on a broad array of evidence to demonstrate a causal link between her protected activity and Defendants' actions taken against her, such as the unusually-suggestive proximity in time between events, as well as Defendants' antagonism and change in demeanor toward Plaintiff after Defendants became aware of Plaintiff's protected activity.

177.    As a result of Defendants' violations of Title VII, Plaintiff has suffered damages, including, but not limited to past and future lost wages, pain and suffering, inconvenience, mental

anguish, loss of enjoyment of life, humiliation, emotional distress, reputational harm, diminishment of career opportunities, and other harm, both tangible and intangible.

**COUNT IV**
**NJLAD DISCRIMINATION**
**N.J.S.A. §§ 10:5-1 et seq.**
**(against Defendant BDA only)**

178.    Plaintiff, Carli DiRienzo, repeats every allegation made in the above paragraphs of this complaint.

179.    The NJLAD prohibits employers from discriminating against a person in compensation or in the terms and conditions of employment based on the person's race, creed, color, national origin, ancestry, age, marital status, civil union status, domestic partnership status, sexual orientation, genetic information, gender, gender identity, disability, nationality, military status, or atypical hereditary cellular or blood trait. See N.J.S.A. §§ 10:5-12(a). Additionally, it is unlawful "for any person, whether an employer or an employee or not, to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this act, or to attempt to do so." N.J.S.A. § 10:5-12(e).

180.    Under the NJLAD, the plaintiff must establish a *prima facie* case of discrimination by showing he/she (1) is, or is perceived to be, a member of a protected class; (2) is qualified for the position; and (3) suffered an adverse employment action (4) under circumstances giving rise to an inference of discrimination. Peper v. Princeton University, 77 N.J. 55, 83 (1978); Williams v. Pemberton Twp. Public Schools, 323 N.J. Super., 490, 502 (App. Div. 1999). In regard to the second element, the plaintiff must merely prove that he or she "was actually performing the job prior to the termination." Zive v. Stanley Roberts, Inc., 182 N.J. 436, 454 (2005).

181.    A plaintiff is not required to prove that their protected category was the only motivation for the defendant's actions; rather, the plaintiff must only prove that their protected category played a role in the decision and that it made an actual difference in the defendant's decision. Bergen Commercial Bank v. Sisler, 157 N.J. 188, 207 (1999).

182.    First, Plaintiff is a member of protected classes based on her sex, and because she complained of or opposed Defendant's unlawful conduct or otherwise engaged in protected activity.

183.    Second, Plaintiff is qualified for the positions and prior to the termination, Plaintiff's productivity was high, and she was performing well.

184.    Third, as outlined above, Plaintiff experienced adverse employment actions and a hostile work environment that culminated in termination.

185.     Finally, Plaintiff was terminated under circumstances giving rise to an inference of discrimination because she was subjected the severe and pervasive statements in reference to and sex, and because she complained of or opposed Defendant's unlawful conduct or otherwise engaged in protected activity, from the beginning of her employment with Defendant; while coworkers outside of her protected classes were not. Additionally, when Plaintiff opposed the unlawful conduct, the hostile conduct increased, and Plaintiff suffered retaliation.

186.    As a result of Defendant's violations of the NJLAD, Plaintiff has suffered damages, including, but not limited to: past and future lost wages, mental pain and suffering; humiliation; emotional distress; diminishment of career opportunities; harm to their business reputation; loss of self-esteem; disruption to their family life; and other harm, pain and suffering, both tangible and intangible.

## COUNT V
## NJLAD HOSTILE WORK ENVIRONMENT
### N.J.S.A. §§ 10:5-1 et seq.
### (against Defendant BDA only)

187.    Plaintiff, Carli DiRienzo, repeats every allegation made in the above paragraphs of this complaint.

188.    The NJLAD also prohibits hostile work environment harassment, which is harassing conduct in the workplace that would not have occurred but for one of the above-mentioned protected characteristics of the employee (e.g., national origin or disability) that is severe or pervasive enough to make a reasonable person with that protected characteristic believe the conditions of the workplace are altered and the working environment is hostile or abusive. Lehmann v. Toys 'R' Us, Inc., 132 N.J. 587, 603-04 (1993).

189.    An employer is strictly liable for unlawful harassment committed by an employee's supervisor where the harassment culminates in a tangible employment action. Lehman, 132 N.J. at 593.

190.    Here, Defendant's conduct (1) occurred because of Plaintiff's legally protected characteristics; and (2) was severe or pervasive enough to make a reasonable person of the same legally protected classes believe that the conditions of employment were altered and that the working environment was intimidating, hostile or abusive.

191.    Since the hostile work environment resulted in Plaintiff's experiencing a "tangible employment action," which includes "discharge, demotion or undesirable reassignment," Defendant cannot raise an affirmative defense to Plaintiff's claims of employer vicarious liability based on delegation of authority. Aguas v. State, 220 N.J. 494, 537 (2015) citing Burlington Industries v. Ellerth, 524 U.S. 742, 765 (1998) and Faragher v. City of Boca Raton, 524 U.S. 775, 808 (1998).

192.    As a result of Defendant's violations of the NJLAD, Plaintiff has suffered damages, including, but not limited to: past and future lost wages, mental pain and suffering; humiliation; emotional distress; diminishment of career opportunities; harm to their business reputation; loss of self-esteem; disruption to their family life; and other harm, pain and suffering, both tangible and intangible.

**COUNT VI**
**NJLAD RETALIATION**
**N.J.S.A. §§ 10:5-1 et seq.**
**(against Defendant BDA only)**

193.    Plaintiff, Carli DiRienzo, repeats every allegation made in the above paragraphs of this complaint.

194.    The NJLAD prohibits employers from retaliating against employees for engaging in "protected activity," such as complaining about, or protesting against, discrimination in the workplace. N.J.S.A. § 10:5-12(d).

195.    The term retaliation can include, but is not limited to, being discharged, demoted, not hired, not promoted or disciplined. In addition, many separate, but relatively minor, instances of behavior directed against the plaintiff may combine to make up a pattern of retaliatory behavior. Nardello v. Twp. of Voorhees, 377 N.J. Super. 428, 433-436 (App. Div. 2005); Green v. Jersey City Bd. of Educ., 177 N.J. 434, 448 (2003).

196.    The plaintiff is not required to prove that their protected activity was the only motivation for the defendant's actions; rather, the plaintiff must only prove that their protected activity played a role in the decision and that it made an actual difference in the defendant's decision. Donofry v. Autotote Systems, Inc., 350 N.J. Super. 276, 295 (App. Div. 2001) ("Plaintiff need not prove that his whistle-blowing activity was the only factor in the decision to fire [her].");

Kolb v. Burns, 320 N.J. Super. 467, 479 (App. Div. 1999) (burden on plaintiff is to show "retaliatory discrimination was more likely than not a determinative factor in the decision").

197.   First, Plaintiff engaged in protected activity when she reported and opposed the unlawful discrimination and unlawful wage/hour practices in the workplace and requested equal pay for equal work.

198.   Second, at the time, or after, the protected conduct took place, Plaintiff was subjected to a pattern of retaliatory behavior, including, but not limited to, termination.

199.   Third, there was a causal temporal connection between Defendant's retaliation and Plaintiff's protected activity sufficient to show that her complaints of workplace discrimination played a role and made an actual difference in the Defendant's decisions to terminate Plaintiff.

200.   As a result of Defendant's violations of the NJLAD, Plaintiff has suffered damages, including, but not limited to: past and future lost wages, mental pain and suffering; humiliation; emotional distress; diminishment of career opportunities; harm to their business reputation; loss of self-esteem; disruption to their family life; and other harm, pain and suffering, both tangible and intangible.

**COUNT VII**
**NJLAD AIDING AND ABETTING**
**N.J.S.A §§ 10:5-12(e) et seq.**
**(against the individual Defendants only)**

201.   Plaintiff, Carli DiRienzo, hereby incorporates all allegations contained in the above-mentioned paragraphs as fully as if they were set forth at length.

202.   New Jersey's Law against Discrimination Section 10:5-12(e) sets forth in pertinent part as follows:

"Unlawful employment practices, discrimination.    It shall be an unlawful employment practice, or, as the case may be, an unlawful discrimination:  e) For any person, whether an employer or an employee or not, to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this act, or to attempt to do so."

203.    Defendants engaged in an unlawful discriminatory practice by aiding and abetting the discrimination against Plaintiff as set forth herein.

204.    Defendants violated all other applicable sections of N.J. Stat. § 10:5-12(e) et. Seq.

205.    As such, Plaintiff has been damaged as set forth herein.

206.    Plaintiff hereby makes a claim against Defendants under all of the applicable paragraphs of the New Jersey's Law against Discrimination.

## JURY DEMAND

PLAINTIFF requests a jury trial on all issues to be tried.

## DEMAND TO PRESERVE EVIDENCE

The Defendants are hereby demanded to preserve all physical and electronic information pertaining in any way to Plaintiff's employment, to her potential claims, her claims to damages, to any defenses to same, including, but not limited to electronic data storage, employment files, files, memos, job descriptions, text messages, e-mails, spreadsheets, images, cache memory, payroll records, paystubs, time records, timesheets, and any other information and/or data which may be relevant to any claim or defense in this litigation.

## PRAYER FOR RELIEF

**WHEREFORE**, PLAINTIFF demands judgment against Defendants, jointly and severally, in an amount to be determined at the time of trial plus interest, punitive damages,

liquidated damages, statutory damaged, attorney's fees, costs, and disbursement of action; and for such other relief as the Court deems just and proper.

**DEREK SMITH LAW GROUP, PLLC**

*/s/ Tova L. Rabin_____*
Tova L. Rabin, Esq.
Attorney ID Number: 383572021
1835 Market Street
Suite 2950
Philadelphia, PA 19103
tova@dereksmithlaw.com
267-332-1692

June 22, 2023